*Tompkins v. Metro-North Commuter Railroad Co.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: NOVEMBER 18, 2019
DECIDED: DECEMBER 17, 2020

No. 18-3174

SHAWN TOMPKINS,
*Plaintiff-Appellant*,

*v.*

METRO-NORTH COMMUTER RAILROAD COMPANY,
*Defendant-Appellee.*

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER and SULLIVAN, *Circuit Judges*, and NATHAN, *District Judge*.[1]

————

---

[1] Judge Alison J. Nathan, District Judge for the Southern District of New York, sitting by designation.

Plaintiff Shawn Tompkins, a carman for Metro-North Railroad at the Croton-Harmon railyard, brought this action under the Federal Railroad Safety Act, alleging unlawful retaliation for his refusal to walk outdoors to another building in the railyard in allegedly unsafe winter conditions or, in the alternative, for his reporting those unsafe conditions to a foreman. The district court (Oetken, *J.*) granted defendant's motion for summary judgment. On appeal, Tompkins argues that the district court committed reversible error (i) by making a factual determination that he did not engage in protected activity when he refused to walk outside between buildings and (ii) by concluding that his safety complaints regarding the state of the walkways did not contribute to any unfavorable personnel action. We find that the district court did not err, and therefore AFFIRM.

————

MARC WIETZKE, Flynn & Wietzke, PC, Garden City, NY, *for Plaintiff-Appellant*.

HELENE R. HECHTKOPF (Miriam Manber, *on the brief*), Hoguet Newman Regal & Kenney, LLP, New York, NY, *for Defendant-Appellee.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff Shawn Tompkins, a carman for Metro-North Railroad at the Croton-Harmon railyard, brought this action under the Federal

Railroad Safety Act (FRSA),[2] alleging unlawful retaliation for his refusal to walk outdoors to another building in the railyard in allegedly unsafe winter conditions or, in the alternative, for his reporting those unsafe conditions to a foreman. The district court (Oetken, *J.*) granted defendant's motion for summary judgment. On appeal, Tompkins argues that the district court committed reversible error (i) by making a factual determination that he did not engage in protected activity when he refused to walk outside between buildings and (ii) by concluding that his safety complaints regarding the state of the walkways did not contribute to any unfavorable personnel action. We find that the district court did not err, and therefore AFFIRM.

## BACKGROUND

We draw the background facts from the parties' statements of undisputed facts submitted pursuant to Southern District of New York (SDNY) Local Rule 56.1, upon which the district court relied in granting summary judgement to the defendant.

Tompkins's primary responsibility is to perform mechanical work on trains. Because Metro-North trains run in all but the most severe weather, carmen are expected to come to work and to perform their normal duties in virtually any weather conditions. The parties

---

[2] 49 U.S.C. § 20109(d)(3).

dispute the extent to which Tompkins's specific job responsibilities require him to work outdoors.

Tompkins has been employed with Metro-North since 1988 and has a history of raising safety complaints, many of which resulted in improved safety measures or increased compliance with safety requirements by Metro-North. Tompkins was not formally disciplined for any of these safety complaints. Tompkins does, however, describe several informal "personal retaliatory actions" that he claims his supervisors directed at him because of his various complaints, including requiring Tompkins to remove a television unit from his locker, delaying his receipt of pay for preapproved vacation days, and barring him from driving his personal vehicle around the railyard.[3]

The disciplinary measures that are the subject of the complaint arise from two incidents in 2014. First, on January 18, 2014, Tompkins refused an instruction from General Foreman Lewis to go with fellow carmen Miller and Stubing from Building 4, Tompkins's normal work station, to the "wheel true," a wheel shop about three-quarters of a mile away. As part of their job responsibilities, carmen go to the wheel true at least three times a week. There are multiple ways to walk from Building 4 to the wheel true, some of which are partially indoors. It had snowed the preceding week, and it was normal practice for

---

[3] J. App'x at 1235.

Metro-North to salt, plow, and clear all roads and walkways at the railyard. Tompkins has not presented evidence to rebut Metro-North's assertion that it followed this practice on January 18, 2014.

Following Lewis's instruction, Stubing went to get the company vehicle but found it was out of order. Stubing and Tompkins informed Lewis, who instructed the carmen to walk to the wheel true. Tompkins refused, citing cold weather and icy conditions on the walkways. Lewis spoke with another General Foreman, Palmietto, who agreed to contact their supervisor, Vasquez. Vasquez decided that if the foremen believed it was safe, they should give the carmen a safety briefing and order them to walk to the wheel true. The foremen determined the walk would be safe and paged the carmen. Tompkins again refused to walk, telling Miller and Stubing that if they agreed to walk to the wheel true now, they would have to walk "all the time."[4] On Vasquez's instruction, Lewis ordered Tompkins "out of service" for his refusal to walk. Tompkins swiped out, ending his shift.[5]

Lewis then gave Miller and Stubing a safety briefing on how to walk safely in winter conditions. Ultimately, however, Miller and Stubing drove to the wheel true in Miller's personal vehicle. Palmietto later walked to the wheel true to meet them, and all three

---

[4] *Id.* at 1243, 1278.
[5] *Id.* at 1244.

rode back to Building 4 in Miller's car. The parties do not dispute that the men got back to Building 4 safely, but they dispute whether "the men slipped at all while traveling to and from" the wheel true.[6]

Vasquez kept Tompkins "out of service" pending an investigation into his refusal to walk to the wheel true. After the investigation closed, Metro-North charged Tompkins with insubordination and failure to perform assigned duties. Tompkins rejected Metro-North's offer of a term of suspension and instead contested the charges in a disciplinary hearing. He was reinstated pending the outcome of the hearing. Following the February 18 hearing, Tompkins was disciplined with a 10-day actual suspension and a 20-day deferred suspension. On appeal within Metro-North's internal disciplinary process, the discipline was reduced to an 8-day suspension with time served, which an arbitration panel subsequently upheld.

The second incident that resulted in discipline occurred on February 16, 2014, two days prior to the hearing on the wheel true incident. Tompkins approached Foreman Palmietto in the Building 4 lunchroom and asked to talk to him about the hearing. Palmietto agreed. The parties dispute exactly what happened next, but they do not dispute that Tompkins asked Palmietto about the substance of his report on the wheel true incident and about discrepancies between

---

[6] S. App'x at 5.

Palmietto's account and that of other witnesses. Palmietto stated that he felt threatened by the exchange, and he reported the incident to Vasquez. Tompkins says he did not threaten Palmietto but concedes that Palmietto seemed "rattled" after they spoke.[7]

Vasquez's investigation of the lunchroom incident consisted solely of an interview with Palmietto. Following the investigation, Vasquez charged Tompkins with "conduct unbecoming a Metro-North employee and disregard of the company's interests."[8] Tompkins was taken "out of service" pending the outcome of these charges. He again refused Metro-North's offered term of suspension and chose to contest the charges. At the disciplinary hearing, he was given a 20-day actual suspension and 30-day recorded suspension, which was reduced on appeal. An arbitration panel ultimately overturned the penalty in its entirety and awarded back pay.

Tompkins brought two claims under the FRSA, relating to the wheel true incident and the lunchroom incident. He alleged that Metro-North unlawfully retaliated against him by disciplining him for his protected conduct of refusing to walk to the wheel true in unsafe conditions or, alternatively, of reporting those unsafe conditions to Foreman Lewis. Metro-North successfully moved for summary judgment on both claims. This appeal followed.

---

[7] J. App'x at 1255.
[8] *Id.* at 1256.

**DISCUSSION**

On appeal, Tompkins argues primarily that the district court erred by concluding that no reasonable factfinder could determine (i) that Tompkins engaged in protected activity when he refused to walk to the wheel true, or (ii) that his safety complaints regarding the state of the walkways contributed to any unfavorable personnel action. Both arguments are meritless.

"We review *de novo* a district court's grant of summary judgment, construing the evidence in the light most favorable to the nonmoving party and drawing all inferences and resolving all ambiguities in favor of [that] party."[9] We will affirm an order granting summary judgment "only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[10]

The FRSA provides a private right of action for railroad employees disciplined for "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties."[11] To prevail in a refusal to work claim, an FRSA plaintiff must show that "a reasonable individual in the circumstances then confronting [him] would conclude that (i) the

---

[9] *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007).

[10] *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 108 (2d Cir. 2006); *see also* Fed. R. Civ. P. 56(a).

[11] 49 U.S.C. § 20109(b)(1); *see also id.* § 20109(d)(3) (creating private right of action).

hazardous condition present[ed] an imminent danger of death or serious injury; and (ii) the urgency of the situation d[id] not allow sufficient time to eliminate the danger without such refusal."[12] Although we have not yet defined "reasonableness" for FRSA purposes, we have done so for whistleblower claims under the Sarbanes-Oxley Act, with which the FRSA shares a procedural framework.[13] We concluded in the Sarbanes-Oxley context that a "reasonable belief contains both subjective and objective components,"[14] and we now adopt that rule in the FRSA context.

This definition is consistent with the practice of district courts in this circuit, which have required an FRSA plaintiff to "show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the

---

[12] 49 U.S.C. § 20109(b)(2).

[13] Several federal employee protection and whistleblower statutes, including both FRSA and the Sarbanes-Oxley Act, explicitly adopt the procedures of the Wendel H. Ford Aviation Investment Reform Act for the 21st Century ("AIR21"), codified at 49 § U.S.C. 42121(b). *See* 49 U.S.C. § 20109(d)(2)(A) (FRSA) ("Any action under paragraph (1) shall be governed under the rules and procedures set forth in section 42121(b)," including (i) "[b]urdens of proof," (ii) "[s]tatute of limitations," and (iii) "[c]ivil actions to enforce."); 18 U.S.C. § 1514A(b)(1)(B) (Sarbanes-Oxley) (providing that actions pursuant to the Act "shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49").

[14] *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (requiring, in the Sarbanes-Oxley context, that a whistleblower "must have a subjective belief that the challenged conduct violates a provision listed in [that Act], and . . . this belief must be objectively reasonable").

conduct constituted a violation."[15] These district courts have also explained that reasonableness for FRSA purposes is "based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee."[16] When a "plaintiff has failed to satisfy the reasonable belief factor required to establish a protected activity under the FRSA, [a] defendant's motion for summary judgment should be granted."[17] Again, we see no reason not to adopt these sensible standards already employed by this circuit in similar whistleblower contexts.

The FRSA also provides a burden-shifting framework for claims brought pursuant to the Act.[18] Under this framework, a plaintiff must "make[] a prima facie showing that any [protected activity] was a contributing factor in the unfavorable personnel action

---

[15] *Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015) (quoting *Nielsen,* 762 F.3d at 221, to apply the definition of "reasonableness" from the Sarbanes-Oxley context in the FRSA context); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 458 (9th Cir. 2018) (quoting *Koziara v. BNSF Ry. Co.*, No. 13-cv-834-JDP, 2015 WL 137272, at *6 (W.D. Wis. Jan. 9, 2015) (noting that district courts have required that "the complainant . . . show that 'he subjectively believed his reported injury was work-related;' and that 'his belief was objectively reasonable'")).

[16] *Hernandez*, 74 F. Supp. 3d at 580 (quoting *Nielsen*, 762 F.3d at 221); *see also March v. Metro-N. R.R. Co.*, 369 F. Supp. 3d 525, 533 (S.D.N.Y. 2019) (applying same reasonableness standard); *Necci v. Long Island R.R. Co.*, No. 16-CV-3250, 2019 WL 1298523, at *15 (E.D.N.Y. Mar. 21, 2019) (same).

[17] *Hernandez*, 74 F. Supp. 3d at 580.

[18] 49 U.S.C. § 20109(d)(2)(A) ("Any action under paragraph (1) shall be governed under the rules and procedures set forth in section 42121(b)" (AIR21), including (i) "[b]urdens of proof," (ii) "[s]tatute of limitations," and (iii) "[c]ivil actions to enforce.").

alleged in the complaint."[19] To make a prima facie case, a plaintiff must show by a preponderance of the evidence "that (1) [the plaintiff] engaged in protected activity; (2) the employer knew that [the plaintiff] engaged in the protected activity; (3) [the plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action."[20] If the plaintiff makes this showing, the burden shifts to the employer to show "by clear and convincing evidence[] that the employer would have taken the same unfavorable personnel action in the absence of that behavior."[21]

Tompkins's challenge requires us to address two questions: (i) whether there was a genuine dispute of material fact that Tompkins's assessment that it was unsafe to walk to the wheel true was reasonable under FRSA, and (ii) whether he has an FRSA retaliation claim on the basis that his reporting of unsafe walkway conditions was a contributing factor to either of his disciplinary incidents. First, on the question of reasonableness, Tompkins argues that the "record created—as a matter of law—a question of fact for the jury as to whether it was reasonable for Tompkins to conclude that a

---

[19] *Id.* § 42121(b)(2)(B)(i).

[20] *See Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013) (adopting burden-shifting test for whistleblower claims under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A); *see also Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (applying the *Bechtel* test to a plaintiff's FRSA claim); *Hernandez*, 74 F. Supp. 3d at 579 (same).

[21] 49 U.S.C. § 42121(b)(2)(B)(ii).

safety hazard existed."[22] Metro-North maintains that there were no material facts in dispute and that it was appropriate for the district court to determine reasonableness on summary judgment.

We agree with Metro-North and the district court that Tompkins has not identified a genuine dispute of material fact over whether the walkways were safe or over the reasonableness of his own assessment. Tompkins did not submit any specific evidence to support his generalized contention that the walkways at the railyard were unsafe, other than to assert that other employees slipped as they walked. In support of that assertion, Tompkins's Rule 56.1 statement repeatedly cited to incorrect portions of Miller's and Stubing's deposition testimony.[23] Even assuming that Tompkins properly disputed whether those employees actually slipped at any point while walking, Tompkins's version of events would nonetheless be insufficient to create a genuine issue of material fact. It is not necessarily true that an employee slipping on a walkway indicates that the trip as a whole presented a hazardous condition, and Tompkins has not submitted any evidence to that effect.

Although Tompkins's assessment that the walkways were unsafe contradicts the other employees' assessments that they were safe, that subjective assessment alone cannot create a genuine issue of

---

[22] Tompkins Br. at 17.
[23] *See* J. App'x at 1238 ¶ 43, 1245 ¶ 79, 1268 ¶ 230.

material fact because the reasonableness requirement contains both an objective and a subjective component.[24] Tompkins has only satisfied the latter. And even when viewing the record favorably to Tompkins, there is no serious dispute that the objective component is not satisfied here.

First, Miller's and Stubing's assessments of the walkways' safety are useful comparison points since they were presented with "the same factual circumstances as [Tompkins]."[25] Neither Miller nor Stubing refused to walk to the wheel true, and Tompkins did not present evidence that the carmen expressed any concern that such a walk would be unsafe. Although they ultimately decided to drive in Miller's personal vehicle, it is possible, for instance, that they simply were tired or cold. And while we recognize the possibility that Miller and Stubing's assessments were objectively unreasonable—in which case they would not tend to prove that Tompkins's contradictory assessment was objectively unreasonable, Tompkins has not presented any evidence to that end.

Foremen Lewis and Palmietto also determined that it was safe for the carmen to walk. Perhaps Tompkins could argue that, as managers, Lewis and Palmietto did not objectively assess safety because they had an ulterior motive for the employees to get to the

---

[24] *See Nielsen*, 762 F.3d at 221.
[25] *See Hernandez*, 74 F. Supp. 3d at 580.

wheel true and continue working. Tompkins has not made this argument, however, nor has he presented any other evidence indicating that Lewis and Palmietto's assessment was unreasonable. Moreover, Palmietto himself walked to the wheel true, indicating that he genuinely believed the walk to be safe.[26]

Tompkins also contends that, regardless of whether refusing to walk to the wheel true was a protected activity, he has an FRSA retaliation claim because reporting unsafe walkway conditions—an FRSA-protected activity—was a contributing factor to both of his disciplinary incidents. We have not addressed the question of what a plaintiff must show to state a claim for retaliation under FRSA.[27] Our

---

[26] Our review of this appeal revealed serious deficiencies in Tompkins's submission in opposition to summary judgment. Under Fed. R. Civ. P. 56(c)(3), the district court is permitted to rely solely upon Local Rule 56.1 statements in deciding motions for summary judgment which is what the district court did here. Tompkins omitted from his Rule 56.1 statement facts in the record that, if considered by the district court, could have potentially led to a denial of defendant's motion. For example, Miller and Stubing testified that the conditions were "treacherous" and "hazardous." J. App'x at 1048, 781. And Miller testified that he agreed to walk because he felt pressure to do so from supervisors. These factual omissions from the Rule 56.1 statement, combined with the error-filled cites previously referenced, raise troubling questions regarding the standard of representation Tompkins received in this case.

Here, the district court expressly stated that it would rely on the parties' Rule 56.1 statement to assess the facts in dispute, which it was entitled to do to the exclusion of other facts in the record that were favorable to Tompkins. *See 24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 46 (2d Cir. 2005); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). For these reasons, we conclude that the district court did not err in holding that no reasonable jury could find that Tompkins's refusal to walk to the wheel true constituted protected activity under the FRSA.

[27] *See Sirois v. Long Island R.R. Co.*, 797 F. App'x 56, 59 n.4 (2d Cir. 2020) ("Whether a retaliation claim requires a showing of intent is . . . an open question in this Circuit.").

sister circuits have split on whether the "contributing factor" prong requires a plaintiff to show that the employer's decision was motivated, at least in part, by a desire to retaliate against the plaintiff for engaging in protected activity.[28]

Having now considered the issue, we agree with the Seventh and Eighth Circuits and hold that some evidence of retaliatory intent is a necessary component of an FRSA claim. "The FRSA provides that a rail carrier may not discharge 'or in any other way *discriminate* against' an employee for engaging in protected activity."[29] And "the essence of [such a] tort is 'discriminatory animus,'" which in turn requires the employee to prove that she was the victim of "intentional retaliation prompted by [her] . . . protected activity."[30] Put simply, "[a] showing of discriminatory animus, which the statute requires, necessarily includes some proof of retaliatory motive."[31]

To establish that retaliation was a contributing factor, an FRSA plaintiff must produce evidence of "intentional retaliation prompted

---

[28] *Compare Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018), *and Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)), *with Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th 2019), *and Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013); *see also Epple v. BNSF Ry. Co.*, 785 F. App'x 219, 222-23 (5th Cir. 2019) (describing the disagreement as whether "the contributing factor language altered the amount of evidence needed to establish a claim under the FRSA" or "jettison[ed] the scienter requirement altogether").

[29] *Kuduk*, 768 F.3d at 791 (quoting 49 U.S.C. § 20109(a)).

[30] *Id.*

[31] *Armstrong*, 880 F.3d at 382.

by the employee engaging in protected activity."[32] The plaintiff need not show that the "contributing factor" was the sole factor affecting the discipline or that the employer acted only with retaliatory motive.[33] The plaintiff must, however, show "more than a temporal connection between the protected conduct and the adverse employment action . . . to present a genuine factual issue on retaliation."[34]

Here, the district court relied on the Eighth Circuit's analysis in *Gunderson v. BNSF Railway Co.* to conduct its "contributing factor" analysis.[35] In *Gunderson*, the Eighth Circuit analyzed "five highly relevant facts" to determine whether the plaintiff's protected activity was a contributing factor in his discharge.[36] With those "highly relevant facts" as our guide, we will consider the following factors: (1) whether and to what extent the disciplinary measures were related to the protected activity,[37] (2) the temporal relationship between the protected activity and the disciplinary measures, including whether any intervening incidents occurred that could independently justify

---

[32] *Lockhart*, 266 F. Supp. 3d at 663 (quoting *Kuduk*, 768 F.3d at 791).

[33] *See Armstrong*, 880 F.3d at 382 ("[T]o make a prima facie case, a plaintiff is not required to conclusively demonstrate that retaliation was the only—or even main—motivation.").

[34] *Kuduk*, 768 F.3d at 792 (internal quotation marks omitted).

[35] *See Gunderson*, 850 F.3d at 969 (quoting *Kuduk*, 768 F.3d at 791).

[36] *Id.*

[37] *See id.* (citing *Kuduk*, 768 F.3d at 792 (observing that the employee's protected activity, "though close in time, was completely unrelated" to the incident that led to the discipline)).

the discipline,[38] (3) whether the disciplined employee was represented by counsel or a similar representative in the disciplinary proceedings, and whether the disciplinary measures were upheld on appeal,[39] (4) whether, if applicable, the disciplinary measures were upheld following Department of Labor proceedings, and (5) whether the persons accused of hostility towards the employee's protected activity participated in the disciplinary decision.[40]

With respect to the discipline following the wheel true incident in Count I, the above considerations on balance weigh in Metro-North's favor. Factors three and five favor Metro-North. As to factor three, Tompkins was represented by union counsel during the disciplinary proceedings, and both the internal appeals board and the arbitration panel upheld the decision. On factor five, Tompkins has not submitted any evidence that would tend to show that the persons aware of Tompkins's reporting of unsafe walkway conditions, Lewis and Palmietto, played any role in disciplining him. Factor four is inapplicable because the Department of Labor proceedings were never completed. Factors one and two favor Tompkins, but only

---

[38] *Id.* (citing *Kuduk*, 768 F.3d at 792 (noting the existence of an "intervening event that independently justified adverse disciplinary action")); *see also Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) ("[C]ausal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event.").

[39] *Gunderson*, 850 F.3d at 969.

[40] *Id.*

slightly: the discipline was close in time and similar in subject matter to the safety complaint, but the disciplinary record expressly states that Tompkins was "not disciplined for raising a safety issue,"[41] and Tompkins has not submitted any evidence to the contrary. Rather, the record supports that Tompkins was disciplined for failing to meet "a legitimate expectation by an employer that when orders are given employees will comply."[42]

As for the discipline following the lunchroom incident alleged in Count II, the third consideration likely favors Tompkins because the arbitration panel overturned the discipline. Factors one and two, however, strongly favor Metro-North. The lunchroom incident that occurred between the safety complaint and the Count II discipline served as an intervening incident and provided an unrelated basis for discipline ("conduct unbecoming a Metro-North employee and disregard of the company's interests"). That this disciplinary finding was ultimately overturned has no connection to whether it was in retaliation for Tompkins's safety complaint, and he has submitted no specific evidence that the discipline was retaliatory. Accordingly, we affirm the district court's grant of summary judgment on the retaliation claim.

---

[41] J. App'x at 899.

[42] *Id.* at 900.

**CONCLUSION**

We have considered Tompkins's remaining arguments and determine them to be without merit. For the reasons stated above, we AFFIRM the judgment of the district court.